```
          IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF VIRGINIA

                    Alexandria Division


Q INTERNATIONAL COURIER,      )
INC. et al.,                  )
                              )
     Plaintiffs,              )
                              )
          v.                  )    1:09cv44 (JCC)
                              )
MIDNITE AIR CORPORATION       )
d/b/a MIDNITE EXPRESS et al., )
                              )
     Defendants.              )
```

## M E M O R A N D U M   O P I N I O N

This matter comes before the Court on Defendants' motion to dismiss for lack of subject matter jurisdiction. For the reasons stated below, the Court will grant the motion to dismiss.

### I.  Background

This case arises out of an alleged "predatory raid" on one shipping company by another. Am. Compl. at ¶ 9. Plaintiffs claim that, in early 2008, Defendant Midnite Air Corp., doing business as Midnite Express ("Midnite"), opened an office in Virginia to compete with Plaintiff Sterling Courier, Inc. ("Sterling") by poaching Sterling employees, using Sterling's business model and proprietary methods, and targeting Sterling customers. Sterling, a corporation chartered in New York, is a wholly-owned subsidiary of New York-chartered and New York-based

1

Q International Courier Inc., which does business as Quick International Courier ("Quick") (collectively, "Plaintiffs").

In its complaint, filed on January 16, 2009 and amended on January 21 (the "Amended Complaint"), Quick states that it is the "preeminent firm in highly specialized fields of emergency time-critical shipments[,] shipments of bio-medical products through its QuickSTAT Division[,] and shipments of aircraft parts through its Sterling Division." Am. Compl. at ¶ 8. Plaintiffs bring nine counts against Midnite and three former Sterling employees who now work for Midnite: defendants Ronald Battaglia ("Battaglia"), Gregory Hanna ("Hanna"), and Sean Reider ("Reider") (collectively, the "Individual Defendants"). Each of the Individual Defendants is a resident of Virginia. Midnite is a California corporation with its principal place of business in California.

Sterling brings suit against the Individual Defendants for breach of fiduciary duty (Count I) and breach of contract (Count III). Plaintiffs are suing the Individual Defendants for conversion (Count VII) and all Defendants for tortious interference with contract (Count IV), tortious interference with business expectancy (Count V), violations of the Virginia Uniform Trade Secrets Act (Count VI) and the Virginia Business Conspiracy Statute (Count VIII), and civil conspiracy to injure Plaintiffs'

business (Count IX). Finally, Plaintiffs are suing Midnite for aiding and abetting a breach of fiduciary duty (Count II).

On February 27, 2009, Defendants filed a motion to dismiss for lack of subject matter jurisdiction, claiming that Plaintiff Sterling has its principal place of business in Virginia and not, as the Amended Complaint alleges, in New York. Plaintiffs opposed the motion on March 13, and Defendants filed a reply brief on March 18. This motion is before the Court.

## II. Standard of Review

Pursuant to Rule 12(b)(1), a claim may be dismissed for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). Defendants can attack subject matter jurisdiction in one of two ways. First, defendants may contend that the complaint fails to allege facts upon which subject matter jurisdiction can be based. *See Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982); *King v. Riverside Reg'l Med. Ctr.*, 211 F. Supp. 2d 779, 780-81 (E.D. Va. 2002). In such instances, all facts alleged in the complaint are presumed to be true. *Adams*, 697 F.2d at 1219; *Virginia v. United States*, 926 F. Supp. 537, 540 (E.D. Va. 1995).

Alternatively, defendants may argue that the jurisdictional facts alleged in the complaint are untrue. *Adams*, 697 F.2d at 1219; *King*, 211 F. Supp. 2d at 781. In that situation, "the Court may 'look beyond the jurisdictional allegations of the complaint and view whatever evidence has been

3

submitted on the issue to determine whether in fact subject matter jurisdiction exists.'" *Virginia v. United States*, 926 F. Supp. at 540 (quoting *Capitol Leasing Co. v. FDIC*, 999 F.2d 188, 191 (7th Cir. 1993)); *see also Adams*, 697 F.2d at 1219; *Ocean Breeze Festival Park, Inc. v. Reich*, 853 F. Supp. 906, 911 (E.D. Va. 1994). In either case, the burden of proving subject matter jurisdiction falls on the plaintiff. *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936); *Adams*, 697 F.2d at 1219.

### III. Analysis

The Amended Complaint asserts the existence of diversity jurisdiction pursuant to 28 U.S.C. § 1332. Am. Compl. at ¶ 7. Diversity jurisdiction requires that all plaintiffs be diverse from all defendants. *See Lincoln Property Co. v. Roche*, 546 U.S. 81, 89 (2005) (citations omitted) ("Since *Strawbridge v. Curtiss*, 3 Cranch 267, 2 L.Ed. 435 (1806), we have read the statutory formulation 'between . . . citizens of different States' to require complete diversity between all plaintiffs and all defendants."). For diversity jurisdiction purposes, § 1332(c) provides that a corporation is "a citizen of any State by which it has been incorporated and of the State where it has its principal place of business." 28 U.S.C. § 1332(c); *see Mullins v. Beatrice Pocahontas Co.*, 489 F.2d 260, 261 (4th Cir. 1974) (per curiam).

The Amended Complaint alleges that Sterling is a citizen of New York, which is both the state of Sterling's incorporation and its principal place of business. Defendants, as the basis for their motion to dismiss, claim that Sterling's principal place of business is actually in Herndon, Virginia. If Defendants are correct, diversity jurisdiction does not exist, because the three Individual Defendants are also citizens of Virginia. *See* Am. Compl. at ¶¶ 4-6.

A. Jurisdictional Allegations

The Amended Complaint alleges that Sterling's principal place of business is in New York, at the same Jamaica address as Quick, its parent company. *Id.* at ¶¶ 1-2. To refute this assertion, Defendants submitted an affidavit by Reider, one of the Individual Defendants who formerly worked at Sterling. Reider explains that Sterling provides expedited services to customers who ship equipment, supplies, and other items within the United States and internationally. Def.'s Mot., Ex. 1 ("Reider Aff.") at ¶ 4. According to Reider's affidavit, Sterling's only location is at 570 Herndon Parkway Suite 300, in Herndon, Virginia. *Id.* at ¶ 5. All of Sterling's approximately 70 employees work from the Herndon office, where they serve as customer service representatives or dispatchers who arrange for the pick-up and delivery of goods by subcontractor-couriers. *Id.* at ¶¶ 5, 6, 10. Reider acknowledges that Quick, Sterling's

5

parent company, handles certain management and administrative functions for Sterling. *Id.* at ¶ 9. But he states that all of Sterling's operations and employees are located in Herndon. *Id.* at ¶¶ 5-7, 10.

Defendants also submitted documentary evidence supporting their argument that Sterling's principal place of business is in Virginia. A printout of Sterling's website shows that Sterling's only listed office address is in Herndon, Virginia; the telephone numbers listed for the corporation have only (800) (toll free) or (703) (Northern Virginia) area codes. *Id.* at 4. Defendants also submitted photos showing that the Jamaica, New York building that purportedly serves as the principal place of business for both Quick and Sterling has at least two signs identifying it as the office of Quick, but none referring to Sterling. *Id.* Finally, several online directories of shipping businesses list Sterling with only a Herndon address and a Virginia telephone number. *Id.* at 4-5.

In response, Plaintiffs note that Sterling operates as a division of Quick. Pls.' Mem. at 2. Sterling's Chief Operating Officer ("COO") and Chief Executive Officer ("CEO"), who both work from the New York office, also serve as the COO and CEO of Quick. Plaintiffs' COO, Dominique Bischoff-Brown ("Bischoff-Brown"), submitted an affidavit stating that Sterling pays the lease on the Herndon call-center facility as well as its

share of the lease on an office near Heathrow Airport in the United Kingdom. Pls.' Mem. at 3; Bischoff-Brown Aff. at ¶ 3. She testifies that Quick and Sterling share a common corporate management team and that Sterling pays its pro rata share for a number of functions performed outside Virginia, including payroll, human resources, and accounting services. Bischoff-Brown Aff. at ¶¶ 7-13. Sterling files its taxes as part of Quick's taxes in New York, not Virginia. *Id.* at ¶ 5.

Quick and Sterling also share sales and marketing functions, including more than 20 sales representatives working in a number of cities in the U.S. and internationally. *Id.* at ¶ 7. All 20 sales representatives, however, are Quick employees. *See* Pls.' Letter to Ct. Sterling uses a nationwide network of 4000 to 5000 independent agents for the pick-up and delivery of packages. *Id.* at ¶¶ 4, 15. While the independent agents are under contract with Quick, Sterling pays their fees for delivering Sterling-facilitated shipments. *Id.*

B. The "Nerve Center" and "Place of Operations" Tests

In the Fourth Circuit, courts use two methods to determine a corporation's principal place of business. "One approach makes the 'home office,' or place where the corporation's officers direct, control, and coordinate its activities, determinative. The other looks to the place where the bulk of corporate activity takes place." *Mullins v. Beatrice*

*Pocahontas Co.*, 489 F.2d 260, 262 (4th Cir. 1974) (per curiam) (citations omitted). These tests are called the "nerve center" test and the "place of operations" test, respectively. *See Peterson v. Cooley*, 142 F.3d 181, 184 (4th Cir. 1998). While it has approved the use of both tests, the Fourth Circuit has not endorsed one to the exclusion of the other. *Id.*

Both Plaintiffs and Defendants rely on *J.A. Olson v. City of Winona*, 818 F.2d 401 (5th Cir. 1987), a case that courts in this circuit have referred to when deciding a litigant's principal place of business. *See Peterson*, 142 F.3d at 185; *Maday v. Toll Bros., Inc.*, 72 F. Supp. 2d 599, 605 n.22, 606 n.27 (E.D. Va. 1999). *J.A. Olson*'s explanation of the manner in which the two principal place of business tests interact is quite helpful. The appropriate test, the court explains, depends on which underlying factors and considerations should predominate in the search for the single principal place of business. *Id.* at 406. "The two tests are . . . not mutually exclusive but rather complementary." *Id.* at 410.

The "nerve center" test applies most appropriately to corporations "'engaged in far-flung and varied activities which are carried on in different states.'" *Id.* at 407 (quoting *Scot Typewriter Co. v. Underwood Corp.*, 170 F. Supp. 862 (S.D.N.Y. 1959), the case that coined the phrase "nerve center"). In a company with operations spanning many states, the center of

8

corporate direction is of paramount importance in deciding where the company is "based." Thus, courts have found the "nerve center" test especially applicable to holding companies, but less helpful in determining the principal place of business for companies largely engaged in a single activity in a single state.[1]

The "place of operations" test, on the other hand, looks to the place where the bulk of the corporation's actual operations takes place. It was first used in 1960 by the Third Circuit in *Kelly v. United States Steel Corp.* to determine that Pennsylvania, where the defendant corporation performed most of its corporate operations, was its principal place of business, rather than New York, the place from which the corporation's directors controlled it. *See J.A. Olson*, 818 F.2d at 408-09 (citing *Kelly v. U.S. Steel Corp.*, 284 F.2d 850 (3d Cir. 1960)).

Courts have used the "place of operations" test in situations where a corporation "'has its physical operations concentrated in one state and its administrative or executive offices in another state.'" *Id.* at 409 (quoting and citing *Lurie Co. v. Loew's San Francisco Hotel Corp.*, 315 F. Supp. 405 (N.D. Cal. 1970)). For example, where the assets of a corporation, the

---

[1] Indeed, the legislative history behind the "principal place of business" requirement emphasized the abuse of diversity jurisdiction by local companies that used a foreign corporate charter to get to federal court in the states where they conducted the bulk of their operations. *See J.A. Olson*, 818 F.2d at 405.

majority of its employees, and the responsibility for day-to-day management were all found in a state different than the state from which corporate policy originated – which might otherwise be considered the "nerve center" – then the former constituted the principal place of business.  *Id.*

Other factors considered by the *J.A. Olson* court include whether the nature of the corporation's activity was labor-intensive or management-intensive, whether a corporation had significant contact with a given state due to its employment of individuals and physical location in that state, such that the danger of local prejudice is reduced, and in how many locations the corporation carried out its corporate activities.  818 F.2d at 406, 411-12.

### C. Sterling's Corporate Operations

As noted above, determining a corporation's principal place of business does not depend so much on the formal choice of tests as on a clear-eyed look at all the factors that determine which *type* of corporation is before the court.  Sterling contends that it is a far-flung, nationwide business receiving corporate direction from a central office, making the "nerve center" analysis appropriate. Pl.'s Mem. at 7.  Defendants suggest that, because all full-time Sterling employees work from Virginia and the bulk of corporate activity undertaken by Sterling itself

10

occurs in Virginia, the place of operations test is better suited to this case.

   The Fourth Circuit has stated that, when a company's business includes active, physical operations by which its presence in a state may be measured – in contrast to, for example, the more passive activities of a holding company – then the "place of operations" test provides the better method for determining its principal place of business.  *Peterson v. Cooley*, 142 F.3d 181, 184 (4th Cir. 1998).  In support of this proposition, the *Peterson* court cites a Ninth Circuit case, *Industrial Tectonics, Inc. v. Aero Alloy*, in which the court reasoned as follows:

> [W]here a majority of a corporation's business activity takes place in one state, that state is the corporation's principal place of business, even if the corporate headquarters are located in a different state.  The "nerve center" test should be used only when no state contains a substantial predominance of the corporation's business activities.

912 F.2d 1090, 1094 (9th Cir. 1990).  Other courts in the Fourth Circuit have applied the "place of operations" test to businesses that derived income from manufacturing and service operations rather than from passive investments, *see Trans/Air Mfg. Corp. v. Merson*, 524 F. Supp. 2d 718, 722 (D. Md. 2007), and have stated that the "nerve center" test is generally appropriate "'only where a corporation is engaged in multi-state activities in offices and plants in different states,'" *W&R Invs. Ltd. P'ship*

11

*v. Star Enters.*, 970 F. Supp. 469, 470 (E.D. Va. 1997) (quoting *Arbee Mech. Contractors Inc. v. Capital Sun Corp.*, 683 F. Supp. 144, 147 (E.D. Va. 1988)).

Between the two tests, the "place of operations" test better fits the facts and circumstances of Sterling's corporate existence. Plaintiffs did not provide any evidence that a single full-time, Sterling-only employee works anywhere outside of Virginia. They did not rebut Defendants' contention that all full-time Sterling employees work from the corporation's Herndon office. The actual business of Sterling – that is, what Sterling employees are paid to do – occurs in Virginia.

Sterling's use of sub-contracted third-parties to perform some business functions, such as package pickup and delivery and payroll services, does not expand its corporate presence or change the "corporate model" used to determine the more appropriate test. Just as contracting for third-party accounting services across state lines would not alter the fundamental structure of a corporation, Sterling's use of third-party contractors to deliver the packages routed from its Herndon office does not suffice to give its corporate existence a nation-wide or international scope.

While the situation presented in this case is fairly unique, courts deciding the principal place of business question in insurance disputes have likewise discounted the actions of

independent contractors and other third parties.  *See Capitol Indem. v. Russellville Steel*, 367 F.3d 831 (8th Cir. 2004) (finding the principal place of business to be outside of Arkansas when, *inter alia*, the insurance company "maintained no offices in Arkansas" and "conducted business in Arkansas only through independent sales agents"); *First Nat. Ins. Co. of Am. v. Wunderlich*, 358 F. Supp. 2d 44, 57 (N.D.N.Y. 2004) (declining to consider the effect of independent brokers and agents in determining the principal place of business); *Ellis v. Provident Life & Acc. Ins. Co.*, 929 F. Supp. 751 (S.D.N.Y. 1996) (declining to count the contacts of independent brokers with individuals in a state as corporate contact with that state).  Allowing the activities of third-party contractors to affect the appropriate principal place of business test would impermissibly shift the focus of the analysis.

Additionally, the Court must respect the separate corporate identities of Quick and Sterling.  While Sterling may pay for services rendered by Quick, and may even share some services with the parent corporation, Sterling's principal place of business must be grounded in the services that actual Sterling personnel perform.  Sterling's place in the Quick corporate hierarchy and the service it provides as a component of Quick's purportedly nationwide business are largely irrelevant to the inquiry.

The Court finds that the bulk of Sterling's activity occurs in Virginia. The provision of some management, sales, and marketing services from New York does not outweigh the fact that Sterling employees conduct the primary business of Sterling in Virginia. The "work" happens in Virginia, which the Court finds to be Sterling's principal place of business.

## IV. Conclusion

Because Sterling's principal place of business is in Virginia, it is a citizen of both New York and Virginia for the purposes of determining whether diversity jurisdiction exists. Its Virginia citizenship destroys complete diversity in this action. The Court will grant Defendants' Rule 12(b)(1) motion to dismiss.

An appropriate Order will issue.

April 29, 2009                                    /s/
Alexandria, Virginia                    James C. Cacheris
                              UNITED STATES DISTRICT COURT JUDGE